Good morning, ladies and gentlemen. Our first case for argument is Driftless Area Land Conservancy v. Rural Utilities Services. Mr. Richmond. Good morning, Your Honors, and may it please the Court. My name is Ben Richmond, and I represent federal defendants. Your Honors, this case concerns a planned electric transmission line between Iowa and Wisconsin with limited federal involvement. Two of the District Court's core holdings below should be reversed. First, the District Court erred in issuing an advisory opinion on whether the hypothetical grant of a pending land exchange request violated the Refuge Act. I have one factual question. Has anything since the briefing happened with respect to the land exchange? No, Your Honor. Okay, it's still pending. All right. Second, the District Court erred in vacating and remanding the federal agency's Record of Decision and Environmental Impact Statement. Plaintiffs lack standing to challenge the Environmental Impact Statement, and in any event, the Environmental Impact Statement here is reasonable and complies with the National Environmental Policy Act. Regarding plaintiff's cross-appeal, the District Court properly determined that it lacked jurisdiction to enjoin intervenors' non-federal actions. Federal defendants rest on their briefs on that point. So turning back to the two core holdings of the District Court which should be reversed here, I want to begin with a land exchange request, and particularly I want to begin with a fax. Intervenors requested a land exchange from Fish and Wildlife Service that, if approved, would allow the CHC project to cross the Refuge. But rather than allow the Fish and Wildlife Service to make a decision on that request, the District Court held that the hypothetical approval of the pending land exchange request would violate the Refuge Act. There were a number of issues in that opinion here, a number of errors. First, plaintiffs did not even plead and thus forfeited a challenge to the hypothetical grant. You cannot seriously mean that. You all presented a moving target to the plaintiffs and to the District Court, and they adapted, and you adapted and responded, right? I understand that circumstances did change during litigations, Your Honor. And is there any doubt that it was in response to the litigation? Your Honor, the Fish and Wildlife Service here rescinded the compatibility determination and right-of-way in good faith. After finding that you'd looked at the wrong easements? Yes, Your Honor. Does that happen often? Your Honor, the agency has to take all the information before it and consider that evidence. Here, the interviewers proposed an amended right-of-way in order to deal with an archaeological concern outside of the refuge, and in reviewing that amended right-of-way application, the Fish and Wildlife Service here determined that it had relied on the wrong easements in issuing its compatibility determination and right-of-way. Why don't you proceed with your argument without worrying too much about what the pleading said before things changed, okay? Certainly, Your Honor. Now, moving on from that point, the district court erred in ruling on a land exchange request in the absence of any final agency action here. Final agency action marks the consummation of a decision-making process, and an action must be one by which rights and obligations have been determined. Mr. Richman, do you agree that the case presented a ripe challenge to a final agency action at the time it was filed? It presented a ripe challenge to a final agency action as the compatibility determination and right-of-way, Your Honor. Right. Okay. Does that mean that in terms of evaluating mootness, we go in the direction of the so-called voluntary cessation doctrine? So, I want to be clear that the federal government does not appeal as to mootness here. Any mootness analysis should be narrowly limited to whether a right-of-way would be reissued in the form of the right-of-way that was rescinded here. So, essentially, the mootness analysis should be limited solely to whether a right-of-way would be reissued, which is not – and that is not an issue we appeal on, Your Honors. We appeal as to the land exchange request, and the land exchange request was lacking final agency action. Plaintiff points to potentially legal issues being final agency actions, but the APA clearly authorizes review of agency action, not of legal issues. Could I ask you some background questions about land exchanges? I gather that the Department has been – the Fish and Wildlife Service has been considering policies and potential regulations for quite some time. Yes, Your Honor. Any, like, years, decades? In terms of the actual time here, Your Honors, I believe the Fish and Wildlife Service began its review of a legal standard for the Refuge Act relatively recently. I cannot put an exact amount of time on it. Would the kind of land exchange that has been proposed for this refuge amount to a major action subject to the National Environmental Policy Act? Yes, Your Honor. Land exchanges are traditionally subject to NEPA compliance. I can't speak to whether it would require an environmental impact statement or an EA. I understand that. Certainly, Your Honor. I understand that, but we know that the previous plan called for an EIS, right? The EIS was developed by three different agencies here, with the Rural Utilities Service as the lead. Right, but Fish and Wildlife and the other both agreed that, in essence, they needed it regardless of what happened with the RUS financing, correct? Fish and Wildlife needed the EIS in order to issue that compatibility determination right away, Your Honor, correct. Can you tell us anything about what the procedure looks like if a land exchange is approved and what the timing looks like and available avenues for judicial review?  Fish and Wildlife Service has guidance on this point as to how land exchange requests are reviewed. It requires appraisal, title review, environmental review, surveys. After going through that process laid out in Fish and Wildlife Service's guidance, the director or regional director needs to approve the land exchange request. That would be the consummation of the decision-making process here. But there's also congressional approval, right? There are some instances in which land exchanges are subject to congressional approval. Would this be one of those? Not to my knowledge, Your Honor. It would not. This would be a type of land exchange request that would be acted on in a final step by a director or regional director of the Fish and Wildlife Service. Would it be subject to state legislative review? Not to my knowledge, Your Honor. Under Section 724? To my knowledge, this only concerns federal lands. It would not be subject to state review. And so just wrapping up my points on the land exchange request, Your Honor, there's also a ripeness problem here. The district court issuing an advisory opinion, essentially declaratory relief, telling the Fish and Wildlife Service how it planned to act on the pending land exchange request interfered with further administrative action. As we've discussed, interferes with Fish and Wildlife Service's ongoing interpretation of the Refuge Act. There's a legal debate between the parties about the standard that might apply. Can you tell me is there a meaningful difference between compatibility and suitability? Yes, Your Honor. Compatibility is a detailed provision of the Refuge Act that the Fish and Wildlife Service has laid out rules on, as well as guidance, a compatibility determination for uses in the wildlife refuge. Whereas suitable for disposition is a separate provision of the statute. I know it's a separate provision. My question is, they seem to me like pretty good synonyms for each other. Do you think there's a meaningful difference between them? Obviously, if we reach the merits of the question, it would seem relevant. Your Honor, this is a question that the Fish and Wildlife Service is currently reviewing at this time. So I don't want to essentially take any position now as to how the Fish and Wildlife Service potentially views a suitable for disposition portion of the statute because review is ongoing. A legal interpretation is ongoing. And so briefly, Your Honors, I do just want to move on to the environmental impact statement here. I've argued that plaintiffs lack standing because of a limited challenge and the rescission of the compatibility determination in right of way. There's no causal connection or ability for redressability based on a future 9% funding request of a minor stakeholder in the project. In addition, the environmental impact statement here complied with NEPA. There was a reasonable purpose and need statement. Court should owe an accord deference the formation of a purpose and need statement. And the purpose and need statement is ultimately judged based on a rule of reason. Here, the Rural Utility Services reasonably relied on MISO's Federal Transmission Planning Authorities in developing its purpose and need statement. MISO exercises Federal Transmission Planning Authority delegated by FERC under the Federal Power Act. Delegated by, are you thinking about the Federal Energy Regulatory Commission? You know it hates to be called FERC. And for generalists like us, using English words is very helpful. Apologies, Your Honor. The Federal Energy Regulatory Commission delegated these transmission planning authorities to MISO. And MISO proposed a suite of different transmission projects, including the CHC project here, based on a technical need. That technical need addressing reliability concerns as well as public policy objectives associated with transitioning the grid to renewable energy. That was the basis as well as the practical needs on the ground for developing a purpose and need statement here. And the Rural Utility Services was able to analyze six different action alternatives. A reasonable analysis of different alternatives here as to its EIS. Six or seven? Excuse me, Your Honor. Six or seven? Six action alternatives and one no action alternative, Your Honor. If there are no other questions for the panel, I'd like to reserve my remaining time for rebuttal. I actually have a couple. Certainly. I'd like to go back. I didn't really hear an answer about the timing of the process and judicial review for a land exchange. Certainly, Your Honor. Just the court seemed to understand that if that's what happens, there's going to be what I believe he called an orchestrated train wreck. So judicial review is available, Your Honors, for a challenge to a land exchange request should that request ever be approved. Under the APA? Under the APA, yes, Your Honors. Okay. And in terms of any concerns the panel might have about continuing construction of the CHC project, interveners have every legal right to continue to build the CHC project, which is a non-federal action. And that building, Your Honor, you know, it's not up to the court to police a litigant's inefficient decision. It's a non-federal decision or action in a project that depends upon the Federal Energy Regulatory Commission's blessing, right? No, Your Honor. So the Federal Energy… That's the planning that you're relying on to establish the need to cross the refuge, right? The agency here reasonably relied on the technical analyses of MISO in developing a purpose for the project, and that's reasonable in light of precedent in this court like Hoosier Environmental Council. An agency can rely on a federal planning process in developing its purpose and need statement. With my colleague's indulgence, one other question I'd like to ask you about. You asserted in your brief that the utilities here can have a legal right to cross the refuge at Stoneman, I believe, without any compatibility determination. Yes, Your Honor. Was that raised in the district court? I do not believe the Stoneman crossing was litigated in the district court, Your Honor, no. Or that the argument was made? Not to my knowledge, Your Honor. And if we were to deem that somehow not forfeited or waived in our looking at this, what would be the theory under which they would do that? The theory is that there are two preexisting easements at the Stoneman crossing, one in 1963 and one, I believe, 1950 easements. Those easements are preexisting uses within the refuge, and for a preexisting use, the Fish and Wildlife Service has established in its guidance that it would not determine compatibility for those preexisting uses. Including the kind of expansion that would be contemplated here? This, in the views of the service, Your Honor, respectfully, it would not be an expansion so long as it was within the existing terms of the easement. The easement at issue here is 150 feet wide, granted in perpetuity. There is no height limit on the easement. And this is essentially just for the point, Your Honor, that interveners have a legal right to do this. This is not something that is recommended or a prominent part of our arguments, but it's just that the interveners do have a legal right to do this based on the existing easements in the law. If there are no further questions, I'll reserve the rest of my time for rebuttal.  Thank you, Your Honors. Ms. Bossart. Thank you. May it please the Court, Stacey Bossart on behalf of American Transmission Company, ITC Midwest, and Daryland Power Cooperative. Your Honor, the Midwest utility companies I represent are working diligently to build the Cardinal Hickory Creek project. It will reliably bring energy from wind-rich areas west of the Mississippi River to population centers east of the river. It is a backbone project that is needed to improve reliability, lower costs for consumers, and move more renewable energy into the grid. The officials responsible under the Federal Power Act for grid planning in the region and the state officials responsible for siting energy projects within their borders determined that the project is needed. MISO and the states conducted extensive public proceedings. Two of the plaintiffs here, DELC, sorry, Driftless Area Land Conservancy and the Wisconsin Wildlife Federation, participated in public hearings. Their arguments about the need for the project, non-transmission alternatives, and rates were considered by the expert agencies and rejected. The district court's flawed decision, which prevents the Fish and Wildlife Service from even considering a proposed land exchange that would be better for the refuge than the status quo, is wrong, and that's why we've appealed. I want to make three points, time permitting. First, the plaintiff's challenge under the Refuge Act to the Fish and Wildlife Service's right-of-way and compatibility determination is moot because the agency revoked those decisions. Second, the court's application of the voluntary cessation exception to mootness was based on an erroneous conclusion that under the Refuge Act, a right-of-way grant and a land exchange are the same conduct. They are not. And finally, the relief the court granted, which can be read to bar any future crossing at the Nelson Dewey location, regardless of the statutory authority used, is not relief that is allowed under the Administrative Procedure Act. I'll talk first about mootness. The court erred when it reviewed plaintiff's Refuge Act challenges to the compatibility determination and right-of-way. The Fish and Wildlife Service revoked those decisions, and plaintiff's claims became moot at that time. Plaintiff's challenge to an agency action becomes moot when the government repeals, replaces, or revises that action. Do you agree, Ms. Bossart, that the land exchange that's being proposed would be subject to the requirements of the National Environmental Procedure Act? Yes, Your Honor. Okay. And that's regardless of what happens with the RUS funding? Yes, Your Honor. Okay. I have to say, my eyebrows went up when I learned that your clients have still been building on the assumption that the injunction is going to be lifted. In Wisconsin and Iowa, is utility infrastructure includable in the rate base if it's never used and useful? Your Honor, first of all, I wanted to point out that there is no injunction. There's declaratory judgment, and the private construction on non-federal land has not been enjoined. I would have to confer. There was a preliminary injunction, right? The preliminary injunction dissolved when the final judgment was issued. Which is a declaration that it can't go forward across the refuge for now. So, still, a bold decision either way. You've got a federal judge saying this can't happen. So, back to the rate question. It can't happen in the right-of-way that the agency has withdrawn. As Mr. Richman mentioned, companies do that. Yes. What about the rate base question? Yes, Your Honor. I might need to confer with my clients about that. The question is, if the infrastructure is not used or useful, can it be included in the rate base? I think that might depend on the circumstances. If you don't know, you don't know. That's fine. Since this is an interstate power line, does the state even regulate that question? The rate base might be important for retail power, but this would be wholesale power. The state regulates the siting of the project within its borders. No. No. Judge Hamilton is asking about the rates charged. And my question, following up on his, if you're going to consult, does the state regulate the rate for power that is going to be sent over these interstate transmission lines? Or is it regulated by the Federal Energy Regulatory Commission? If regulated by anyone these days, given the amount of competition in transmitting interstate power. You obviously are not prepared for this question. But when the time comes to answer it, you need to answer the who as well as the what. Your Honor, my understanding is that the Federal Energy Regulatory Commission regulates those rates pursuant to its tariff.  Its tariff. If you could use real words, a point I made with Mr. Richmond, it would help us generalists. These briefs are not very easy to read. And the table of acronyms and initialisms doesn't make them any easier. Parts of these briefs are just a commentary on how bad legal writing is. For us generalists, being able to understand what the lawyers are talking about is terribly important. And a page so full of non-words that no outsider can understand them is not helpful. Ms. Bossert, you suggested in your brief, in a footnote, that we ought to invite what I might call FERC, but we'll call the commission, the Federal Commission, to intervene or to express its views in this case. Yes, Your Honor. Do you still want us to do that? Yes, Your Honor. Even though the United States has told us what its views are? And even though it would cause more delay? Do we have any examples of a court asking for the commission's view when the United States is here in its own name? Your Honor, my understanding is that the United States is here representing the three defendant agencies. The United States is here in its own name, represented by the Department of Justice. Yes, Your Honor. The district court here reached the merits because it found that an exception to the mootness doctrine applied. Under the voluntary cessation exception, a case is not moot only if there is a substantial likelihood that the defendant intends to return to its prior wrongful conduct. This court emphasized that government officials are presumed to have acted in good faith when they repeal or revoke something. Here, there's no reason not to apply that presumption because Fish and Wildlife Service does not intend to issue another right-of-way for the project. The agency's letter explains why it revoked the compatibility determination and that it will review the land exchange application instead. This is the August 3rd, 2021 letter? Yes, which is repeated in the August 27th letter. During briefing, the government reiterated that it does not intend to issue any authorization similar to the revoked right-of-way. What does that have to do with mootness? Your Honor, the... Right? The district court relied on the voluntary cessation doctrine. Yes. Right? The agency could change its mind at any time. Right. So voluntary cessation applies when there's reason to believe a substantial likelihood that the agency intends to return... Only a substantial likelihood? I thought the Supreme Court said no possibility is the question. Well, Ozinga v. Price used the... I just don't understand why anybody cares about mootness. This is a permission that has been revoked, right? Issuing declaratory judgments against things that don't exist may be an abuse of discretion quite apart from any issue of mootness. I don't see why you think you have to dig in on the mootness issue on which the district court has already said you lose. Your Honor, the... Well, we've appealed the district court's mootness... I understand that, but... And we... You face a... Let's just say you face an uphill task given what the Supreme Court says about voluntary cessation. Government officials are presumed to have acted in good faith... You're not getting my question. I'm asking why you care. Yes. Your Honor, so the paragraph 2 of the court's judgment says the court declares that the compatibility determination precludes the Cardinal Hickory Creek transmission line as currently proposed from crossing the refuge by right-of-way or land transfer. If the court believes, as it appears to, that a compatibility determination is required for a land exchange, it may view this question as precluded if there is a future land exchange that the plaintiffs challenge. And the government actually paused its work on our land exchange application as a result... Judge Hamilton, do you have any further questions? I just thought I might try one more time with Ms. Bossart and ask if you think there's a difference between suitability and compatibility. Yes, I do, Your Honor. Compatibility is used in three different places in Section D of the Refuge Act, which applies to uses of refuge lands by third parties. Suitability is used in Section B, which applies to land exchanges. Yes. Compatibility is a statutorily defined term. Suitability is not. Clearly, Congress knew how to include that compatibility language when it thought it was necessary. It did not do so in the land exchange provision. So is it just the Wild West, open discretion for the Director on suitability? We don't think it's necessary for this court to opine on suitability to decide our appeal. You might have to. Would you answer the question, please? That will be determined by the Fish and Wildlife Service Agency if and when it acts in our favor. Look, counsel, you're being asked by a member of this court how you understand two legal terms. Saying that something will be decided by the Fish and Wildlife Service doesn't begin to answer that question. Like Judge Hamilton, I really wish you would address the questions being asked. Your Honor, because we do not have an administrative record upon which to apply a statute... The meaning of a statute does not depend on an administrative record. What is your understanding of the meaning of these two terms? I do not understand suitability to be as stringent as compatibility. Regardless of what it means, our project satisfies it. This crossing at Nelson Dewey is better for refuge resources than the existing status quo. And it's certainly better than an option in which we would exercise our rights to unilaterally build the project. All right. Thank you, counsel. Thank you, Your Honors. Mr. Lerner. Good morning, Your Honors. And let me go, if I might, to some of the questions the court has been asking on compatibility versus suitability. Compatibility is in the statute. It's defined. The Fish and Wildlife Service may not initiate or permit a new use of a refuge, or expand or renew or extend an existing use unless it's compatible. The statute, we agree with Ms. Bossart, goes on to define compatibility. Suitability is in the regulations. It's in the statute with respect to land exchange. With respect to land exchange, if I might, Your Honor, wrap up the suitability and go to the land exchange. Sure. Suitability is in the regulations. It's ill-defined, but it has to comply with two things. Number one, the agency itself cannot dispose of land that Congress set aside for the National Wildlife Refuge in the 1924 law. That's not within the agency's powers. Secondly, the agency has to comply with its own comprehensive conservation plan, which is aimed at protecting wildlife and protecting wildlife habitat. So suitability has to be a parcel that isn't valuable in terms of wildlife protection, isn't valuable in terms of the conservation comprehensive plan that the agency has. That's some piece of land somewhere that really isn't central to the refuge or doesn't have anything to do with wildlife protection, which is not what we're dealing with here. So does this imply that you think an agency would be forbidden to say, well, we have parcel A, which is beneficial to wildlife. We're being offered parcel B in exchange, which is also beneficial to wildlife, maybe even more so. Is the agency forbidden to make that comparison by the statutory language? Your Honor, that's exactly what the 1997 Act was designed to deal with. If you look at the legislative history here and you look at what this— I want you to deal with the statute. We always start with the statute, and if there's ambiguity, maybe we talk about legislative history. The statute says the Fish and Wildlife Service may not initiate or permit a new use of a refuge. That's a transmission line, huge transmission line. My question is about the swap, not about the permission to cross the land. So please deal with it in those terms. All right. With regard to the swap, per se, first of all, both provisions, the principal provision in the statute dealing with compatibility and then the piece that talks about land exchange, have to be read in terms of what the statute's trying to do and what it says. May not permit or initiate a new use. Can we just limit it to what the statute says? That's what the statute says, Your Honor. I wish the district court had talked about what the statute says. The district court said he's talking about intent and common sense, neither of which is in the statute. We believe the district court also spoke about the statute, Your Honor, but I'll speak about the statute so we don't have a disagreement on that. Section 668 small d, small d, D3AI. The Fish and Wildlife Service, quote, may not initiate or permit a new use of a refuge or expand, renew, or extend an existing use unless it's compatible. I wish you would talk about the proposed land swap, not about the transmission corridor. I understand your argument about the transmission corridor. I don't know how I can be clearer. I wish you would deal with the question I have asked. So with regard to the land swap, the statute says that any new use has to be compatible and it doesn't create a get-out-of-jail-free card, if you will, for a land exchange. A land exchange, a right-of-way on an easement must be compatible. All right. I will try once more. Yes, sir. What in the statute do you rely on for the proposition that an agency is forbidden to say, if we give up this section of the refuge, that will be a loss, but we give that up in exchange for a greater gain with a land accession to the refuge? What in the statute forbids that kind of comparison? Your Honor, that is exactly the discretion. What in the statute, please? And I'm giving you that provision. 16 U.S.C. section 668DD, the Fish and Wildlife Service may not initiate or permit a new use of a refuge, and it doesn't matter whether that is a— You're back to the corridor again. I'm sorry. Unless the Secretary has determined the use is a compatible use? Compatible use. That's correct. Okay. So we're back to compatibility. That's correct. Our position— Do you agree that the statute does contemplate new power lines in D-1B? Only if they are compatible. Right. And, Your Honor, what the reason— But they are presumably at least—that's not an empty set, right? Congress is telling us it's at least possible to build a new power line through a wildlife refuge. There are a lot of things that could be possible. However, they have to be compatible. In order to be compatible, they have to comply with the wildlife protection purposes, which is what a refuge is about, a refuge to protect wildlife. They have to comply with the Fish and Wildlife Service's comprehensive conservation plan. They have to comply with the compatibility requirement, which this does not. Keep in mind, the Fish and Wildlife Service has now withdrawn the compatibility requirement, and it's because this— They've withdrawn the compatibility finding. Finding—excuse me, Your Honor, I misspoke. You think, in essence, there's still a compatibility requirement for the land exchange, right? The compatibility requirement applies whether it's a land exchange or whether it's a right-of-way easement. Congress has spoken. That's the text of the statute. What Congress was doing there was dealing with a problem. The problem was that there was too much let's-make-a-deal work being done by Fish and Wildlife Service, oftentimes under political pressure or economic pressure, and what they were doing was approving too many transmission lines and too many refuges. That's exactly why this statute was created. It was created to take away that discretion and that sort of let's-make-a-deal swapping and do exactly what that compatibility sentence does. Unless, whether it's a right-of-way or whether it's an easement, whether it's a land exchange, it must comply with the compatibility standards. So Stoneman got raised earlier by counsel. With regard to Stoneman, Your Honor, Judge Hamilton, it's sort of the moving target that you mentioned earlier. Stoneman is a currently low-voltage power line. This is a high-voltage power line. It would be about twice as wide, almost the size of a football field, and the towers would be 195 feet, about 20 stories. That's not compatible. Why? Aesthetically, what makes it incompatible? Because the arguments in your brief have a lot to do with aesthetics. The verbs used are colorful, but they go to aesthetics versus going to substance. The substance of a wildlife refuge, it's a refuge to protect wildlife, and the comprehensive conservation plan is designed to protect wildlife and protect and consolidate wildlife habitat. The Upper Mississippi River National Wildlife and Fish Refuge is a north-south refuge with a Mississippi flyway that has about 40 percent of the nation's birds going north and south. This is a huge, tall, wide transmission line going east-west that would fragment wildlife habitat that is contrary to the purpose of a refuge to protect wildlife and at the same time is contrary to the comprehensive conservation plan of the Fish and Wildlife Service, which they must do, that is aimed at protecting wildlife and consolidating fragmented habitat. This huge transmission line would fragment the habitat, and it would create an east-west barrier to birds flying north and south. The argument that I'm hearing from you is different than the argument I'm reading in the briefs, though. I believe, Your Honor, we had it in the briefs, but I'm not going to argue about whether you thought some was more this or was more that. It's just an additional fragmentation that you're objecting to, because there's obviously already easements and movement across the river. It's this type of fragmentation, this additional fragmentation that you're objecting to. And that's what the 1997 Act, Your Honor, was designed to change. What it was designed to change was there can't beóit was designed to keep a bad problem from becoming worse. It was designed to make sure that there aren't more large projects, transmission lines and others that are not compatibleócompatible being the text of the statuteó with the purposes of a wildlife refuge, which is to protect wildlife, and the purposes of the comprehensive conservation plan, which is to consolidate and unfragment habitat rather than fragment it and break it up again. This is not an incidental development. This is a huge development. Scale matters. It must be compatible, whether it's a new use or whether it's an expansion, renewal, or extension of an existing use like Stoneman. Low going to high, much wider, much biggeróthat is an expansion or an extension. Congress was pretty deliberate in its language. Compatibility must be determined. The Fish and Wildlife Service could not, as a matter of law, under the text of the statute, as a matter of physical reality or as a matter of common sense, say that a huge transmission line going east-west, cutting off wildlife access and fragmenting the habitat was somehow compatible with the statute and the purposes of the Fish and Wildlife Service under the 1997 National Wildlife System Improvement Act or under the 1924 law that created the Upper Mississippi River National Wildlife and Fish Refuge, which is the gem of the system in the Midwest. I believe it's the fourth most visited in the country. So that is the purpose here, and the provisions need to be read in that context. I'll turn to American Hospital Association, the Supreme Court's recent decision, 142 Supreme Court, 1896, in which the court says they're hesitant to adopt an interpretation that would eviscerate such significant aspects of the statutory text. There was to be a survey done before reimbursement rates were changed by Health and Human Services. There is a way in which the plaintiffs argued that the agency was relying on some different provision of the statute to get out away from the principal part of the statute, and the Supreme Court said in American Hospital Association, you can't do that. Why would Congress establish the Refuge Act's elaborate system of compatibility determinations and define compatible use if the agency could avoid that completely by simply going to a land exchange? Why would Congress so clearly limit the agency on one hand and then somehow expand it on the other hand, and the defendants have absolutely no good answer to that? This is a huge new project that is simply not compatible with a protected wildlife refuge, and it's not compatible in terms of the comprehensive conservation plan, which is designed to consolidate rather than fragment habitat. Most of the time when land exchanges occur, it's not for some new expanded use. It's because there's an in-holding in the midst of a current parcel. Somebody has it, the Fish and Wildlife Service wants to consolidate the wildlife habitat, so they do a land exchange to consolidate it, not to split it apart with a huge transmission line. That's why they've withdrawn the compatibility determination. I'd be pleased to address for the Court any particular questions on the NEPA or on the arguments involving the Refuge Act. I do want to make sure I can get to our injunction claim in a minute, but I also want to make sure I'm responding to the Court's questions. On the environmental impact statement issue, why are you entitled to any relief now other than, in essence, a prospective bar for funding for dairy land? First of all, what we're entitled to is that under Simmons and the District Court's decision, this was an environmental impact statement that didn't comply with law, it didn't comply with NEPA. We're entitled to relief now both as a procedural matter. What relief? We're entitled to the relief of an injunction for the reasons we've explained. Against what? An injunction against both the Fish and Wildlife Service and the federal agencies from allowing anything to go through the refuge, and secondly, against the non-federal parties. And there is a lot of case law, we've said in the briefs and I'll turn to it in a minute, in which the courts have said that if it's necessary to protect federal public lands, injunctions can be issued that involve non-federal pieces. Keep in mind here the environmental impact statement that was signed by all three of the federal agencies. They all did it together. They all said even if there wasn't funding for the Rural Utility Service, there still had to be an environmental impact statement because of all the permits and so forth. That was on the entirety of the 102-mile transmission line because none of those segments had any independent value. The EIS was on the whole transmission line. Redressability here goes to the plaintiffs being able to have two things happen before all the construction is done. Number one, alternative routes that avoid the refuge were not considered. The district court was correct after having reviewed the extensive administrative record. They must be considered. On the route question, I know you have non-transmission alternatives as well, but on the route question, why is it that, and maybe defense counsel could address this in rebuttal, but why is it that, for example, the city of Dubuque gets a complete veto power over transmission through the city, but the refuge users do not? Your Honor, I think that is a very good question, and I think it's more appropriately addressed to the government. I'll say that on behalf of plaintiffs, we concur with at least the implication, I think, of your question. With regard to the alternative routes, though, EPA said early on. I'm not sure what that means, counsel. What that means, Your Honor? Do you think the transmission line could be routed through a city that doesn't want it? The Supreme Court held two years ago that the federal statutes permit the condemnation of public land. I assume that includes city-owned land. Your Honor, I'm going to speak, I think, slightly outside the record here, if I might. The city of Dubuque in the state of Iowa said, heck no, you're not going through Dubuque, and for whatever reason they decided not to push it. I wish you'd listen to the question. I am, Your Honor. The Supreme Court two years ago held that transmission utilities have the ability to condemn publicly owned land. Doesn't that permit this coalition to override any objections by the city? Your Honor, we didn't make the decision. All right, so you're not answering my question. Your Honor, I can't answer. I'm asking you a legal question. I'm not asking whether you think something is wise. Your Honor, as a matter of law, we haven't briefed it. I don't want to go into it. I think it's a fairly complicated issue there. Yes, but I asked you to. Right? Your Honor. Your Honor, when a judge asks a question, the lawyer's response, I don't want to answer, is rarely viewed as satisfactory. Fair enough. Fair point, Your Honor. All right? I believe it's unclear under current federal law whether the interveners and the federal government could force the city of Dubuque to have a transmission line go through their city. I understand there are arguments on both sides. They made a decision for whatever reason, and you're better off asking them than me, that they weren't going to pick that battle with Dubuque, so they did what city of Overton Park always counsels about. They went through the public land, the National Wildlife Refuge, and that is wrong. And, Your Honor, I'm going to address another question you asked as well as I can. This transmission line, the rates are set by the Federal Energy Regulatory Commission. The transmission companies receive a 10.5% rate of return profit on their investment, which at present exceeds $550 million. They say it may be much higher. Over the course of 40 years, it's between $2 and $3 billion. And so the follow-up to Judge Hamilton's question then is, does the commission permit that rate of return on investments that are not transmitting any power? And, Your Honor, that's exactly where I was going to go next. We have filed a document with the Federal Energy Regulatory Commission as a matter of public record raising exactly that issue, whether it is prudent or not. In our view, there's serious questions about whether it's prudent for the transmission companies to have kept spending money at least after the preliminary injunction was granted by the district court. And the Federal Energy Regulatory Commission has not yet acted on our request. That's the most information I can give you on that. I believe it addresses the question you raised. If I could, Your Honor, I would like to turn just very briefly. Well, we took the other lawyers over time, so I'll give you some leeway here. Thank you, Your Honor. I appreciate it. I'll turn to the injunction, and I'll go right to the question that I think, Judge Hamilton, you were asking me about before. There is case law here, the Eighth Circuit, State of Minnesota, X. It's in our brief. CLEPI, Supreme Court's decision, Maryland Conservation Coalition, the Fourth Circuit, Fourth Circuit, Eighth Circuit, CLEPI, the Supreme Court, Ninth Circuit, Saverson-Aron, and White Tanks cases are all in our briefs. All of those cases say that when it's necessary to protect federal land, Congress and the courts with their equitable powers can act upon non-federal lands. Okay? This EIS covered both federal lands. It wasn't just the 1.5 miles and the refuge. It covered 102 miles. One part of the EIS they have to look at is the cumulative impacts of projects that are federal, non-federal, state, and private. Doing this environmental impact statement, the three agencies looked at all sorts of things that were on non-federal lands. And to go back and do a legally compliant environmental impact statement, they will have to look at the impacts of non-federal lands. And that's why the Eighth Circuit, the Fourth Circuit, the Ninth Circuit, and the Supreme Court and CLEPI said where it's necessary to protect federal lands, the courts can act with regard to non-federal lands. Otherwise, we wind up here with exactly the orchestrated train wreck that the district court was describing of the transmission companies spending hundreds of millions of dollars creating unnecessary environmental damage going all the way up to the edges of the refuge. With what the Fourth Circuit has called the gun barrels, the Eighth Circuit has called the steamroller effect, saying now you've got to let us go through the refuge. An injunction can stop that. It can put a pause in the construction so the bad situation isn't getting worse. We've explained why we meet the Monsanto standards, and we believe that this court should either grant the injunction or with instructions go back to the district court, which erred not as a matter of weighing the facts, but as a matter of legal error and that the district court believed it didn't have the authority, which the courts indeed do, to act on non-federal lands. Because otherwise what we're going to get is a land exchange at some point in the future where we're told we will get 30 days' notice. That's what's been said by the defendants and the interveners. We'll then have 30 days to file the same complaint with the same transmission line on the same parcel, the same impacts on wildlife, in an emergency injunction going back to the district court. The injunction can pause this and hold off that trial. I'm a little worried, counsel, about this line of argument, and indeed maybe I should have asked about it earlier. Because it seems to say that the final agency action requirement in the APA can be universally dispensed with. Because once the agency has made a final action, people can act in reliance on it. And we want to give the courts more time, and therefore the courts just don't need to wait for final agency action. Now, of course, if that's right, and that's pretty much what the district court said, the APA requirement of final agency action is defunct. Don't we need to obey that part of the statute? You think that's inconvenient, and it may lead to hasty decision, but that's what the statute says. Your Honor, I don't just think it's inconvenient. I think it's actually incorrect. Abbott Labs and Hawks in the most recent, what the Supreme Court said in West Virginia. Abbott Labs is about pre-enforcement decisions, not pre-decision review. That's correct. And Hawks adopts it in a different context. And the San Francisco Herring Association adopts it in a different context. What the courts have said, Abbott Labs, San Francisco Herring Association, Hawks, it's pragmatic. You have to look at what the situation is. So we follow the statute or we don't based on some pragmatic decision? Is that what the Supreme Court says these days about following statutes? Your Honor, that is what the Supreme Court has said. It's not what Abbott Labs said. Abbott Labs, there was a final agency decision, but it hadn't been enforced yet. There's a difference between pre-enforcement review and pre-decision review, and I'm asking you why you think the former line implies the latter. We believe Hawks fits into the rubric that you're talking about, Your Honor. But let me go just a bit beyond that, and I know you've given me some extra time. In the facts of this case, throughout this litigation, we've been told we're either too early or we're too late. I wish you would discuss the statute. The Ninth Circuit heads you in, tails you out. I wish you would discuss the statute. Because in the statute, Your Honor, I have to go back to how the Supreme Court has interpreted the statute, and the Supreme Court has simply taken a much more flexible approach than the textual approach that you're suggesting. So what case do you rely on other than Abbott Labs? We will rely upon Hawks, 578 U.S. at 599, Hawks v. Army Corps, and the Ninth Circuit San Francisco Hearing Association being two cases that we think are directly on point. So you have one Supreme Court case, and that's it? Well, Hawks fouled Abbott Labs, Bennett v. Speer. Then it went to Hawks, and we believe we meet the standard. The agency is committed to the land exchange without committing to do a compatibility analysis. That's what the August 3rd letter and the continuing series of actions show. Another is the practical pragmatic prejudice, that's Bennett v. Speers, that we're facing because while we're being told you're too early or too late, delay, delay, delay, the transmission companies are building, building, building. So one response by this court would be to enter an injunction that pauses the construction. All right. Unless and until you reach a conclusion. Thank you. Thank you very much. Mr. Richmond, anything further? Yes, Your Honor, if I may. Thank you, Your Honors. I briefly wanted to address some of the questions the panel had. So first as to the routing alternative at Dubuque, state law controls siting, and here- By Dubuque. Dubuque. My apologies, Your Honor. The EIS here has a detailed explanation of not only why this bar on siting in this area from the city made it not feasible, but also other reasons that the crossing wasn't feasible, such as unresolvable engineering conflicts with bridge safety, issues with bridge maintenance, the crossing of numerous residential properties, and being routed through urban residential development. That's all at IA 864. As to the panel's questions about cost recovery, my understanding is that cost recovery proceedings here would take place after the project is completed. But I think the greater point, Your Honor, here- Does the commission have any precedent on the point? I wasn't available. Excuse me, Your Honor. I wasn't available to have that precedent here, Your Honor, for the court's availability. But I do want to emphasize that in Hoosier Environmental Council, as this court has provided, this challenge by plaintiffs should not be used to collaterally attack FERC's ongoing proceedings or any ongoing transmission proceedings here. In terms of the level of environmental protection at the Nelson Dewey Crossing versus other crossings, I want to emphasize the Nelson Dewey Crossing is more environmentally protective than Stoneman. That's both because of a 270-foot right-of-way that allows for lower power line poles at only 75 feet within the refuge, which reduces avian impacts, as well as rearranging and co-locating interruptions in the refuge. If a crossing were to occur at Nelson Dewey, the existing power lines at Stoneman would be moved to be co-located with an existing road as well as an active rail line, and that would reduce the number of fragmentation, essentially fragmented segments in the refuge. And that's in addition to the land exchange. Now, should any land exchange, the land exchange as proposed calls for that plan, shutting down the Stoneman Crossing, co-locating these uses at Nelson Dewey. And as to the last point, Your Honor, I just want to emphasize that suitability has not been defined by the Fish and Wildlife Service. It is an open question, and that open legal question, I think, just further illustrates why it's not appropriate to determine whether compatibility determination is required for land exchanges. There's been no final agency action on the decision associated with land exchanges. It's not ripe for review. That issue should only be passed on with agency rationale, a record, and an opportunity for the Fish and Wildlife Service to take on the issue in the first instance. For these reasons, Your Honor, the judgment of the district court is the land exchange and the EIS should be reversed. Thank you. Thank you, counsel. The case is taken under advisement.